[Sac. No. 1504.   In Bank.—May 15, 1907.]

## COUNTY OF TRINITY, Respondent, v. COUNTY OF MENDOCINO, Appellant.

BOUNDARY LINE BETWEEN TRINITY AND MENDOCINO COUNTIES—ACT OF MARCH 30, 1872—FORTIETH PARALLEL OF NORTH LATITUDE—LINE ERRONEOUSLY ESTABLISHED BY SURVEY.—Under the acts of 1851 and 1853, making the fortieth parallel of north latitude the dividing

line between the counties of Trinity, Humboldt, and Mendocino, and the act of March 30, 1872, providing for a commission of survey to be chosen by the boards of supervisors of such counties, which was authorized to appoint a surveyor, who was directed to "accurately run, thoroughly mark, and place monuments on the line between" the respective counties, and further providing that the "lines run out, marked and defined as required by this act are hereby declared to be the true boundary lines of the counties na-ned herein," the line so established and marked on the ground by such surveyor became and has since remained the true boundary line between the counties of Trinity and Mendocino, although a subsequent survey, made in 1891 at the request of the board of supervisors of Mendocino County, under the direction of the surveyor-general of the state and under the supposed authority of section 3969 of the Political Code, established the fact that such line did not follow the fortieth parallel of north latitude, but was run about two miles south thereof.

ID.—SECTIONS 3969 TO 3972 OF POLITICAL CODE—ACT OF MARCH 30, 1872, NOT REPEALED—LEGISLATIVE POWER TO FIX BOUNDARY LINES. —The provisions of the act of March 30, 1872, are not necessarily so inconsistent or repugnant to sections 3969 to 3972 of the Political Code, which took effect on May 1, 1872, and which provided that all common boundaries of counties not adequately marked by natural objects or legal surveys were to be definitely established either by a joint survey of the respective county surveyors or by the surveyor-general, that either would by implication repeal the other. At that time there was no constitutional objection to a special law on the subject, and the legislature had the power to enact a special law for the survey of any particular county lines, and make it conclusive until it should itself change the lines or order another survey.

ID.—ACT OF MARCH 30, 1872, SUPERSEDED CODE PROVISIONS—SPECIAL AND GENERAL LAWS.—Even if the act of March 30, 1872, were inconsistent with section 3969 of the Political Code, the special act would prevail. That code was passed on March 12, 1872, and under section 4478 thereof is to be considered as if passed on December 4, 1871. The act putting sections 3969-3972 of it in force on May 1st, was enacted on March 22, 1872. The special act of March 30, 1872, being the later enactment, would prevail over the code, because where two inconsistent laws are enacted at the same session of the legislature, the one last adopted prevails. Furthermore, as it is a special law relating to one of a particular class of subjects, it would not be repealed by a general law subsequently passed embracing the entire class of subjects, including that treated in the special law.

ID.—SURVEY OF BOUNDARY LINE NOT LEGISLATIVE ACT.—Section 10 of the act of March 30, 1872, declaring that the line to be run by the surveyor selected in accordance with its provisions, when it was so run, marked, and defined, should be the true boundary line of the counties, is not a delegation to such surveyor of the legislative

function of fixing the limits of the territory of the respective counties, and is not in conflict with the provisions of section 1 of article III of the constitution of 1849, prohibiting the powers of one department of the state from being conferred upon another department. The legislature had established the boundary of the respective counties, and the process of surveying and marking the line was not a legislative function, but was purely ministerial in character, and necessarily of such a nature as to require the legislature to provide for the employment of a surveyor to do the work.

ID.—LEGISLATURE MIGHT APPROVE SURVEY IN ADVANCE.—It was competent for the legislature to declare in advance of the work that the line which might be surveyed and marked by the surveyor should be the true boundary line.

ID.—PROVISION TO "ACCURATELY RUN" LINE—INACCURATE SURVEY NOT VOID.—The provision in the act that the surveyor, when employed, should "accurately run" the line of the fortieth parallel was directory only, and did not have the effect to render the survey void if he ran it inaccurately, without fraudulent intent.

ID.—LEGISLATURE MUST CHANGE BOUNDARIES OR CORRECT ERRORS—COURTS CANNOT CORRECT ERRONEOUS SURVEY.—The location of the county lines is a political question, to be settled by the legislative power of the state, and subject to change from time to time as the legislative power may direct. If the line as fixed in accordance with its directions is inaccurately located by the person whom it has directed to make the survey and place the marks, the correction of the error lies with the legislature and not with the courts, unless it has provided that the courts shall determine the true location, which it has not done.

ID.—POWER OF SURVEYOR-GENERAL IN RESURVEYING BOUNDARIES.—The common boundary line between Mendocino and Trinity counties, ever since the survey made under the act of March 30, 1872, having been adequately marked by monuments, lines, and surveys lawfully made, there was no necessity or authority for a resurvey by the surveyor-general, under section 3969 of the Political Code, unless the monuments of that survey had been displaced or destroyed so that the line was no longer adequately marked. In that event the surveyor-general could be called upon to resurvey and mark the line under the provision of the Political Code, but in so doing it would be the line fixed by the survey under the act of March 30, 1872, which he must survey and mark, and not the actual position of the fortieth parallel of north latitude, and it is entirely immaterial whether there was or was not a dispute concerning the location of the line when the act of March 30, 1872, was passed and the survey made thereunder.

ID.—PROVISIONS OF CODE FIXING BOUNDARY LINE—RE-ENACTMENT OF PREVIOUS LAWS.—The sections of the Political Code declaring that the fortieth parallel of north latitude should be the common boundary did not, when they took effect on May 1, 1872, work any

change, or in any way affect the act of March 30, 1872. The same parallel had been previously fixed by law as the boundary, and the code is to be construed merely as a re-enactment and codification of the previous law on the subject, and not as a new enactment, and therefore it does not operate as a repeal by implication of the act of March 30, 1872, declaring that the line when fixed thereunder should be the true line. The survey had under that act had fixed for all legal purposes the position of the county line, and section 10 of the act in effect declared that. this line was for that purpose, in contemplation of law, the fortieth parallel of north latitude.

APPEAL from a judgment of the Superior Court of Tehama County. J. F. Ellison, Judge.

The facts are stated in the opinion of the court.

Robert Duncan, District Attorney, for Appellant.

H. R. Given, District Attorney, and D. J. Hall, for Respondents.

SHAW, J.—By the acts of 1851 and 1853 the fortieth parallel of north latitude was made the dividing line between the counties of Trinity, Humboldt, and Mendocino, and constituted the north line of Mendocino, and the south line of Trinity and Humboldt. The line was not well defined or marked on the ground, and the legislature, by the act of March 30, 1872 (Stats. 1871-2, p. 766), provided for a commission of survey to be chosen by the boards of supervisors of the counties concerned, and authorized such commission to appoint a surveyor, who was directed thereupon to "accurately run, thoroughly mark and place monuments on the line between" the respective counties. The commission appointed and employed one W. H. Fauntleroy, a surveyor, to survey and mark the line. He proceeded to make the survey and place the monuments as required by the act, completing and filing same in the respective counties on October 30, 1872. Section 10 of the act provided that "The lines run out, marked and defined as required by this act are hereby declared to be the true boundary lines of the counties named herein."

Doubts appear to have arisen in regard to the accuracy of Fauntleroy's survey and location, on the ground, of the

fortieth parallel constituting the boundary between Trinity and Mendocino counties.    In 1891 the board of supervisors of Mendocino County, proceeding under section 3969 of the Political Code, requested the surveyor-general of the state to survey and establish the line between the two counties.    Upon this request, and under the supposed authority of the code, the surveyor-general appointed Sam H. Rice, a surveyor, to survey and mark the line.    This Rice proceeded to do, and the survey by him was completed and approved by the attorney-general on December 18, 1891. Both Rice and Fauntleroy undertook to locate the true position on the ground of said fortieth parallel of north latitude. It so happened, however, that the line thereof, as established by Rice, is located parallel to the line established by Fauntleroy and about two miles north thereof, thus leaving a strip about two miles in width and some thirty-one miles long between the two lines.   Since that time, each of these counties has claimed this strip of land as part of its territory, and both have attempted to exercise jurisdiction over and to levy and collect taxes on the property situated thereon.

This action was begun by Trinity County to enjoin the county of Mendocino from further claiming this territory, or from exercising, or attempting to exercise, sovereignty over it.    Findings and judgment were given in the lower court in favor of Trinity County.    The defendant appeals.

The court below, in its findings, declared that the line established by Rice is, in fact, on the fortieth parallel of north latitude, and that the line established by Fauntleroy is, in fact, nearly two miles south of said parallel.    The judgment was given for the plaintiff upon the theory that the Fauntleroy survey established the situation of the county boundary, regardless of the fact that it did not correctly locate the position of the said north parallel.

By virtue of the special act of March 22, 1872, which took effect at its passage, all of title one, part four, of the Political Code, including sections 3969 to 3972, took effect on May 1, 1872.    These sections provide that all common boundaries of counties not adequately marked by natural objects or legal surveys were to be definitely established, either by a joint survey of the respective county surveyors, or by the surveyor-general.    If these sections had been the

only law applicable to these counties at the time of the Fauntleroy survey in October, 1872, that survey would have been unauthorized and void. But the act of March 30, 1872, also took effect upon its passage. It was not necessarily so inconsistent or repugnant to the sections above cited that either would by implication repeal the other. The state may provide for as many surveys of county boundaries as the legislature may deem best. After having provided in these sections that any county lines not adequately marked should be run and marked by the surveyor-general, it was still in the power of the legislature to enact a special law for the survey of any particular county lines, and make it conclusive until it should itself change the lines, or order another survey. A survey under such a special act would be a legal survey. The act of March 30th was a special act for the survey of the common lines of these particular counties, and the Fauntleroy survey made under it in October, 1872, was a legal survey, even if the provisions of section 3969 were also in force at the time. There was at that time no constitutional objection to a special law on the subject.

Even if the act of March 30, 1872, was inconsistent with section 3969 in this respect, it would not be the code, but the special act which would prevail. This is evident from the dates of the respective acts and the rule of law on the subject. The code was passed March 12, 1872, and is to be considered as if passed December 4, 1871. (Pol. Code, sec. 4478.) The act putting these parts of it in force on May 1, was enacted on March 22, 1872. The special act of March 30, 1872, being the later enactment, would prevail over the code. Where two inconsistent laws are enacted at the same session of the legislature the one last adopted prevails. (*Ex parte Sohncke,* 148 Cal. 262, [113 Am. St. Rep. 236, 82 Pac. 956]; *Estate of Wixom,* 35 Cal. 320; *People* v. *Phoenix,* 6 Cal. 93; *People* v. *Dobbins,* 73 Cal. 259, [14 Pac. 860]; *Smith* v. *McDermott,* 93 Cal. 424, [29 Pac. 34]; *Davis* v. *Whidden,* 117 Cal. 622, [49 Pac. 766]; *Mariposa Co.* v. *Madera Co.,* 142 Cal. 55, [75 Pac. 572]; *State* v. *Halliday,* 63 Ohio St. 165, [57 N. E. 1097]; 26 Am. & Eng. Ency. of Law, 736.) Furthermore, as it is a special law relating to one of a particular class of subjects, according to the rule of statutory construction in such cases, it would not be repealed by a gen-

eral law subsequently passed embracing the entire class of subjects, including that treated in the special law. (Sutherland on Statutes [1st ed.], secs. 157, 158; *People* v. *Quigg,* 59 N. Y. 88; *Anderson* v. *Hill,* 42 N. J. L. 351; *Vail* v. *Easton,* 44 N. J. L. 239; *State* v. *Mills,* 34 N. J. L. 180; *People v. Palmer,* 52 N. Y. 88; *Crane* v. *Reeder,* 22 Mich. 322; *Robbins* v. *State,* 8 Ohio St. 191.)

It is claimed by appellant that section 10 of the act of March 30, 1872, declaring that the line to be run by the surveyor selected in accordance with its provisions, when it was so run, marked and defined, should be the true boundary line of the counties, is unconstitutional. It is said that the act delegates to the surveyor the power to fix the limits of the territory of the respective counties, that this is a legislative act which cannot be delegated by the legislature to a ministerial or executive officer, such as a surveyor, and, hence, that it is contrary to the provision of section one of article three of the constitution of 1849 to the effect that the powers of one department of the state cannot be conferred upon another department. We cannot agree to this view. The legislature had established the boundary of the respective counties and had declared that the fortieth parallel of north latitude is the line which separates them. That line was not marked on the ground so that its position could be known to the citizens and parties interested, nor was its precise location ascertained. It was deemed necessary that it should be so located and marked. The legislature could not, itself, go into the field and survey and mark the line. Nor is the process of surveying and marking a line a legislative function. It is purely ministerial in character. (*Holley* v. *Orange Co.,* 106 Cal. 424, [39 Pac. 790].) It was, therefore, not only proper, but necessary, that the legislature should provide for the employment of a surveyor to do the work.

It is conceded that if, after the survey was made, the legislature had enacted a law providing that the line so marked should be the boundary line between the counties, it would thereupon constitute such boundary, no matter how much it deviated from the true line or position of the fortieth parallel, and that even if such subsequent act was passed in ignorance of the mistake or error in the survey, it would make no difference in this respect. But it is contended that it was not

competent for the legislature to declare, in advance of the work, that the line which might be surveyed and marked by the surveyor should be the true line. We can see no essential difference between the two propositions, so far as the mere matter of legislative power is concerned. The rule in regard to such legislation is thus stated by the authorities: "The legislature cannot delegate the power to make laws, but it can delegate the power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." (*Locke's Appeal,* 72 Pa. St. 491, [13 Am. Rep. 722]; *State* v. *Thompson,* 160 Mo. 333, [60 S. W. 1077, 83 Am. St. Rep. 468, 54 L. R. A. 950]; *Boyd* v. *Bryant,* 35 Ark. 69, [37 Am. Rep. 6]; *Pueblo Co.* v. *Smith,* 22 Colo. 534, [45 Pac. 360, 362]; *In re Flaherty,* 106 Cal. 558, [38 Pac. 981]; 8 Cyc. 830; 6 Am. & Eng. Ency. of Law, pp. 1029, 1032.) The case is similar in principle to those cases where it is held it is not a delegation of legislative power to commit to some officer, person or board the power to determine the fact that an applicant for some license or privilege is or is not of good character, or possesses or does not possess some other qualification necessary to entitle him, under the law, to the license or privilege, and empowering such officer, person or board, if it shall determine that such person has the necessary qualifications, to forthwith issue the license. In such cases the law declares that a certain class of persons are entitled to the license. The determination of the fact that a particular applicant is of the class described in the law as so entitled, is not a legislative act, but one which is either ministerial or judicial, and, hence, to commit the power to make such determination to any other person or body is not a delegation of legislative power. The cases above cited are chiefly of this class. Here, the legislature having declared that the county boundary should be the fortieth parallel, it further provided that its location should be established by a surveyor and marked accordingly, and that the line so fixed and marked should be the true boundary. The surveyor was directed to ascertain the position of that parallel on the ground in accordance with the rules of his science and by means of the instruments of his profession. The exact position was presumably unknown. Perhaps it may be said that it cannot, by human means, be ascertained with absolute certainty.

It was therefore competent for the legislature to settle all controversy over the question by providing for a survey and declaring in advance that the line as surveyed should be the true boundary line. It cannot be conceded that the legislature cannot delegate the power to determine contrary to the fact. The power to decide necessarily includes the power to decide erroneously, but the fact once decided, whether true or false, is nevertheless effective for its purpose.

The act provided that the surveyor, when employed, should "accurately run" the line of the fortieth parallel. It is contended that the effect of this language is that if he ran it inaccurately his survey would be void; that the words quoted were a limitation upon his power, such that he could make no legal survey unless it was absolutely correct. We deem the language quoted directory only. This is made sufficiently clear by section 10 above quoted. That section manifestly was made in view of the contingency that the survey might not be absolutely correct, and its purpose and effect was that, whether correct or not, the line surveyed and marked should thereupon be the true line. The construction contended for would leave the county lines always subject to change and uncertainty. For if the line must be absolutely accurate in order to be valid, if the true line of that parallel and not any particular surveyed line thereof, is to be the true county line, it would be subject to relocation and change whenever new discoveries, more accurate instruments, or more careful surveys, should demonstrate that the previously surveyed line was incorrectly located on the ground. If the true line of the parallel, and no other, was to be the lawful line, the surveying and marking of any line would accomplish nothing. It would, indeed, indicate the place where the particular surveyor ascertained and believed the position of the true line to be, but such location would be merely tentative, and subject always, whenever the location of the line was in issue, to dispute upon the claim that it was not the true line, and to proof which might show it to be false. And there would be no remedy except by legislative act. The matter of establishing a county boundary is for the legislature. If it has declared that the true line of the parallel is the line, the courts cannot declare any other line to be the boundary, in the absence of legislative authority to so declare. The court

can declare and construe the law on the subject, but it cannot declare and establish the fact that the parallel is situated elsewhere than in its true location, and if that location is to be the sole criterion, the court's decree must be as much subject to such inquiry and dispute as the survey of any surveyor. It is not to be supposed that the legislature intended to reduce the proposed survey and location to such a mere idle ceremony.

It is said that under this theory of the law, the surveyor might arbitrarily locate the line ten, fifteen, or even fifty miles from the true line. There is no charge that the surveyor fraudulently located the line. What the effect would be if he did act fraudulently we need not decide. But so far as mere inaccuracy is concerned, it seems clear that it would not affect the question. In any event, the location of the county lines is a political question, to be settled by the legislative power of the state, and subject to change from time to time as the legislative power may direct. If the line as fixed in accordance with its directions, is inaccurately located by the person whom it has directed to make the survey and place the marks, the correction of the error lies with the legislature and not with the courts, unless it has provided that the courts shall determine the true location, which it has not done.

The finding of the court is that the common boundary line between Mendocino and Trinity counties was, and ever since the Fauntleroy survey has been, adequately marked by monuments, lines, and surveys lawfully made. Such being the fact, there was no necessity or authority for a resurvey by the surveyor-general, under section 3969 of the Political Code, unless it appeared that the monuments of the Fauntleroy survey had been displaced or destroyed so that this line was no longer adequately marked. In that event the surveyor-general could be called upon to resurvey and mark the line under the provisions of the Political Code above cited. But if he should be called upon to make such survey it would be the Fauntleroy line which he must survey and mark, and not the actual position of the fortieth parallel of north latitude.

It is entirely immaterial whether there was, or was not, a dispute concerning the location of the line when the act

of March 30, 1872, was passed and the survey made thereunder. The matter was within the power of the legislature, regardless of the existence of any such controversy. The surveyor was to locate the line, but if by error he did not truly locate it, nevertheless the line he marked was to be the dividing line, and his act was made binding upon the respective counties and all citizens and inhabitants of the state, the legislature alone having power to correct or change it. The rules regarding surveys of disputed boundary lines between coterminous owners of land have no application to this case.

The sections of the Political Code declaring that the fortieth parallel of north latitude should be the common boundary did not, when they took effect on May 1st, work any change, or in any way affect the act of March 30, 1872. The same parallel had been previously fixed by law as the boundary, and the act is to be construed merely as a re-enactment and codification of the previous law on the subject, and not as a new enactment, and therefore it does not operate as a repeal by implication of the act of March 30, 1872, declaring that the Fauntleroy line when fixed should be the true line. (*Swem v. Monroe*, 148 Cal. 741, [83 Pac. 1074].) The survey of Fauntleroy had fixed, for all legal purposes, the position of the county line, and section 10 of the act, in effect, declared that this line was for that purpose, in contemplation of law, the fortieth parallel of north latitude.

The judgment is affirmed.

Sloss, J., McFarland, J., Angellotti, J., Lorigan, J., and Henshaw J., concurred.